## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| BANK OF AMERICA, NA | ) | |
| *Plaintiff/Counter-Defendant* | ) | |
| v. | ) | **Case No. 22-Cv-1764** |
| YAJIA HU SCHWARTZ, INDIVIDUALLY AND AS | ) | |
| TRUSTEE OF THE  YAJIA HU SCHWARTZ | ) | |
| REVOCABLE TRUST, MARK A. SCHWARTZ, | ) | |
| INDIVIDUALLY AND AS TRUSTEE OF THE | ) | **JURY TRIAL DEMANDED** |
| AXIS INVESTMENT HOLDINGS TRUST | ) | |
| *Defendants/Counter-Plaintiffs,* | ) | |
| *Putative Class Action Plaintiffs/Representatives* | ) | |

---

## COUNTERCLAIMS AND CLASS ACTION COMPLAINT

---

Now comes Yajia Hu Schwartz, Individually and as Trustee of the Yajia Hu Schwartz Revocable Trust, ("Yajia") and Mark A. Schwartz, Individually, and as Trustee of the Axis Investments Holding Trust, "(Mark") by and through the undersigned, and files this action on behalf of themselves (Yajia and Mark), and on behalf of the putative Class(es) I-XX of all other persons similarly situated, as defined herein, [1] against Bank of America, NA. ("BOA"), for Breach of Contract, Mortgage Servicing Fraud, and violations of the Federal Fair Debt Collection Practices Act, 15 U.S. Code § 1692f et seq.[2], and in furtherance thereof, states as follows:

---

[11] Putative Classes I-XX: All existing and prospective customers, depositors, mortgagees, borrowers, or lending clients of Bank of America nationwide, who sought and applied for residential loan/mortgage modification or other financial assistance, help, or accommodation with a pre-existing BOA loan or mortgage program due to financial or other hardship ("Client(s)") between 2003 through the date of class certification where, during the pendency of such  applications, Bank of America added forced placed insurance, foreclosure, or tax escrow charges, and interest and/or penalties on that insurance added to their loan balances, and as may be further broken down, defined and amended during the course of discovery.

[2] 15 U.S. Code §1692f §807 (False or misleading representations) & §808 (Unfair practices).

## I.    <u>NATURE OF ACTION</u>

1.        This case arises out of Bank of America's willful Breach of Contract, Mortgage Fraud, and violations of both Federal and Local State Fair Debt Collection Practices Acts in relation to that certain Note secured by property located at 460 El Mirador, Edwards, Colorado 81632 (the "Property"). [3]

2.        The Undersigned, Mark A. Schwartz MD, JD, had been a private client of Bank of America since the early 1980's when he routinely carried multi-million dollar balances there.   In 2003, as a private client, Mark negotiated a $1,000,000, twenty year 5.75% fixed rate 1st mortgage loan with Bank of America to fund approximately 40% of the subject Property's purchase price, with <u>no</u> escrow, insurance, or tax reserve, and a fixed monthly principal and interest payment of $5,875.33.  (Exs. A-F)

3.        For the first 16 years of the loan, Bank of America charged $5,875.33 per month, just as agreed. But after August 21, 2019, when Yajia and Mark's submitted a good faith request for mortgage assistance due to temporary financial hardship, (Ex. I), when the loan balance was only $665,087.18 (Ex. J), everything suddenly changed.

4.        Since August 2019, Bank of America has fraudulently inflated this amount by one quarter of a million dollars. By March 16, 2022, Bank of America inflated that amount from $665,087.18 to $882,485.16. (Ex. Q)

5.        Bank of America unjustifiably and inexplicably denied Yajia and Mark's August 2019 request for loan modification (Ex. I) and the two others that followed in November 2020 (Ex. L)  and January 2021 (Ex. P) violating all known standards and guidelines for such modification at

---

[3] And in re: other certain note(s) ("Class Member Note Nos. 1-10,000,000") secured by other certain real estate owned/financed by members of the putative Class(es) I-XX, (Class Member Property Nos. 1-10,000,000) and as may be further broken down, defined, and amended during the course of discovery.

that time, during covid-19, from degreed professionals with good credit history experiencing a temporary hardship, refinancing an income producing asset, where the Bank had literally no risk of non-payment by all objective measures of either value or income. [4] (Ex. M)

6. Instead, Bank of America <u>did just the opposite</u>, tortiously abusing the Property rental revenue information and other documentation that Yajia and Mark supplied in good faith to obtain help and mortgage assistance, (Exs. I, L, P, M) and implementing a forced place insurance scheme in June 2020 that increased the loan's fixed monthly debt service amount by 33%, from $5,875.33 to $9,204.33, (Ex. K) thereby *increasing*, not reducing, its customer's hardship by a quarter million dollars ($222,708.35) as of March 2022 (Ex. Q), via a fraudulent "forced placed insurance and escrow scheme' (Ex. K) which was in breach of the original loan documents (Exs. A-F) and 16 years' of documented loan history. Bank of America's clear plan was to falsely inflate its customer's debt, increase its client's hardship and likelihood of default, and in the interim, block its customer's access to statements, letters and notices (Ex. N).

7. Instead of honoring its contract, depository agreement, and conducting itself in good faith, Bank of America instead had engaged in bad faith, fraudulent and deceptive practices designed to enrich itself at the expense of its customer and the record Property owner so Bank of America could eventually take the Property for itself via a non-judicial process, which was almost assured because Bank of America already controlled both the first and second mortgages on the Property. [5]

---

[4] Why refuse to remove Wendy as a 'co-borrower' when she had no liability on the Note? Why not add the additional security of adding a <u>true</u> co-borrower, Yajia, a professional with an interest in the Property since 2009? Why refuse to lower the rate or extend the term when the Note was Over-Secured By A Factor Of 6X, with a LTV Of 17% and there was No Risk Of Nonpayment by all objective measures based on the Property's Value or Documented Income Sufficient To Cover Annual Debt Service, Insurance, And Taxes By Factor Of 3x!  (659,776/3,860,000=.17)

[5] Bank of America acquired the $1.85M 2nd mortgage on the Property via its acquisition of Countrywide Home Loans in 2008. Since that time that 2nd mortgage has been in the hands of both Bank of America and Wells Fargo, another bank which the Undersigned has a long adversarial history against in two unrelated litigation matters.

8.      In so doing, committing mortgage/servicing fraud with respect to its client, violating its contractual obligations under the loan documents, its depository agreement, its duty of good faith and fair dealing, Federal Fair Debt Collection Practices Act.

9.      At some point, after their *first* Request for Mortgage Assistance on August 21, 2019, and their Request an Expedited Loan Payoff on March 10, 2022 (and likely before June 2020) Bank of America tortiously abused the information supplied by Yajia and Mark about the value of the Property to make the internal decision that it was going to **deny** the request for assistance, **increase** the hardship, and **take the Property for itself by non-judicial sale.** [6]

10.     After learning from Mark and Yajia how valuable the Property was and being positioned to take it by default due to their hardship and its control of both mortgages, Bank of America formulated a plan to fraudulently increase that hardship and take their Property by default at nonjudicial sale, a plan it continues to be intent on implementing even today, notwithstanding the primacy and pendency of earlier-filed federal judicial proceedings in this **US. District Court Case No. 22-Cv-00930** with exclusive jurisdiction over the Property. Critically, in **USDC Case No. 22-Cv-00930, First-Filed** on **April 18, 2022,** three unrelated adverse parties (1) Yajia's Trust, (2) the Adams' Trust, and (3) EagleBank are already each seeking to **Quiet Title** to the Property.

---

[6] This decision was likely made sometime before June 2020 when Bank of America increased the loan's fixed monthly payment amount by 33%, from $5,875.33 to $9,204.33 – a sham forced placed insurance scheme, doing so while Yajia and Mark's request for mortgage assistance was still under review, and based upon Yajia and Mark's good faith disclosure that without the modification they were seeking since August 2019, they would not be able to renew their existing policy with Chubb without such modification and assistance as its annual premium was scheduled to double in 2020 to nearly $13,000 from $5,800 for the $5,000,000 of coverage that Bank of America was demanding. After Yajia and Mark learned that the Bank had imposed the forced placed insurance, BOA claimed the placement was irrevocable even if replacement insurance was obtained. Bank of America would not even provide copies of this purported "insurance", because it likely was a sham and either never existed at all, or only covered Bank of America, and not them as property owners, against loss. Moreover, even after Yajia and Mark obtained the $5,000,000 in coverage demanded by Bank of America in June 2021, BOA refused to accept it, and issued another forced placed policy again in June 2021.

11.      If BOA has claims, USDC Case 22-Cv-00930 is where they belong, not here.

12.      Nevertheless, despite full knowledge of this and these first-filed federal <u>judicial</u>
proceedings by three unrelated parties each seeking to Quiet Title to the Property in their favor since
April 18, 2022, Bank of America nonetheless filed this untimely and abusive R. 120 Action – racing
to state court with a bad faith on June 29, 2022, R. 120 action – and doing so by intentionally
deceiving and misleading the Undersigned otherwise on July 16, 2022 following L.R. 7.1(a)
Conferral, with the clear intention to immediately and decisively, and summarily divest and
dispossess every litigant in in First-Filed USDC Case No. 22-Cv-00930, of all right title and interest
the Property.

13.      Why?  Clearly Bank of America wishes to keep this valuable Property for itself and
do so for pennies on the dollar.  And clearly, Counsel for Bank of America remains steadfast in her
intent to do so (See D.12, Verified Motion for Remand), notwithstanding her deception of an
opposing party and member of the bar, its impermissibility under the Priority Rule, and her patent
disregard of this Court's L.R. 7.1(a), as set forth below.

14.      We know BOA remains intransigent and intent upon taking the Property for itself by
<u>nonjudicial</u> means because there would be no other reason for Bank of America's Counsel
Dell'Acqua to commence a non-judicial sale on March 10, 2022, preparing a 'Notice of Election and
Demand' (Ex. R), Certificate of Record Owner of the Property pursuant to §38-38-101(g) (Ex.  CC)
and transmit these along with other documents listed in her Cover Letter to the Eagle County Public
Trustee's Office on March 10, 2022 (Ex.DD), –the <u>same day</u> Bank of America received Mark's
March 10, 2022, Expedited Loan Payoff Request (Ex. S)

15.      We know BOA remains intransigent and intent upon taking the Property for itself by
nonjudicial means because Bank of America intentionally delayed responding to Mark's and the

Title Company's Repeated Expedited Payoff Requests (Exs. R, T, U) until March 16, 2022, (Ex. V).

16.    BOA's delayed responding to these multiple Payoff Requests to give the  Public Trustee's office time to complete its file, as can be readily seen from the 3/16/22 dates in the Trustee's document file (Ex. EE), ready to record BOA's Notice of Election and Demand in Eagle County the next morning on March 17, 2022. (Ex. W)

17.    BOA also delayed responding to these multiple Payoff Requests to add $2,885 in fraudulent foreclosure fees and costs, which its Counsel tacked on and incurred only after receiving an Expedited Payoff Request on March 10th – not before, and also to overcharge $15 in phony recording fees ($28, when it cost $13)(Ex. V)

18.    We know BOA remains intransigent and intent upon a plan to take the Property for itself by default at nonjudicial sale because if it wanted to be repaid there would be <u>no reason to start</u> a non-judicial sale proceeding after receiving multiple Expedited Payoff Requests (Exs. R, T, U), for a Sale set to close days later on April 4, 2022, nor would there be any reason create a record title exception by doing so which might interfere/delay that closing. (Id.)

19.    We know BOA remains intransigent and intent upon taking the Property for itself by default and **nonjudicial** means because after the Undersigned personally contacted its counsel Dell'Acqua on July 16, 2022 pursuant to Dist. Col. Local Rule 7.1(a) to obtain Bank of America's consent to *his* forthcoming Motion in Case No. 22-Cv-00930, To Stay the Public Trustee Sale and any forthcoming Rule 120 non-judicial administrative filings, and specifically discussed this as well as the primacy and previous pendency of **first-filed** federal District Court **<u>judicial</u>** proceedings already pending in Case No. 22-Cv-00930 since April 18, 2022, **with exclusive jurisdiction over the Property and in personam jurisdiction over 3 adverse litigants already seeking to Quiet Title to the Property** over the course of their 8-10 minute conversation.

20.     Later that day, on June 16, 2022, Dell'Acqua's senior partner at McCarthy Holthus, Shilliday sent the Undersigned a false and misleading e-mail, copying Dell'Acqua and other persons at the firm, to buy time and placate the Undersigned, while Shilliday then proceeded to docket this R. 120 action June 29, 2022, but without ***any*** further warning, advice, notice, email, or any further communication or conferral of any nature with the Undersigned either prior to doing so or even afterwards – the Undersigned had to discover this R. 120 action *for himself*, nearly a month later, on July 11, 2022. See, Exhibit X.

21.     Indeed, as can be seen from a review of Exhibit X, after the Undersigned reached out to Opposing Counsel on July 16, 2022, pursuant to LR. 7.1 (a), that Bank of America's Counsel blatantly abused this Court's Local Rule 7.1 (a) and the Undersigned's duty of conferral and disclosure and then, mislead and deceived the Undersigned with the following false and misleading email on July 16, 2022, so she could file this Rule 120 action to accelerate the sale, not postpone it, **falsely** representing to an opposing party and fellow member of the bar:

> "We are unable to indefinitely postpone the foreclosure sale with respect to the above-referenced matter. I can tell you the current foreclosure sale date will be postponed as Bank of America, N.A. has not yet filed the Motion for Order Authorizing Sale with the court." (Ex. II)

22.     Shilliday's email was clearly a ploy to buy her enough time to file a R. 120 action and Motion for Order to accelerate the Sale, not Stay it – the exact opposite of what she falsely stated in her e-mail, but then did *herself*, without further LR. 7.1 (a), conferral or notice.

23.     Counsel for Bank of America should never have filed this non-judicial action, which must be stayed or dismissed, given the primacy and exclusive jurisdiction of **first-filed** federal **judicial** proceedings in Case No. 22-Cv-00930.

24.    Procedurally this abusive and sanctionable **non-judicial** action was docketed deceitfully – <u>during L.R. 7.1 (a) conferral</u>, and with full knowledge of the pendency of first-filed federal **judicial** proceedings with exclusive jurisdiction over the Property must be stayed or dismissed.  *Town of Minturn v. Sensible Housing Co*., 2012 CO 23, 273 P.3d 1154 (2012)("Where two courts may exercise jurisdiction over the same parties and subject matter, we have stated that the first action filed has priority of jurisdiction, and that the second action must be stayed until the first is finally determined ("priority rule")). *Wiltgen v. Berg*, 164 Colo. 139, 145-46, 435 P.2d 378, 381 (1967); *Martin v. Dist. Court*, 150 Colo. 577, 579, 375 P.2d 105, 106 (1962) The purpose of the priority rule is to promote judicial efficiency and "avoid unnecessary duplication and multiplicity of suits." *Pub. Serv. Co. of Colo. v. Miller*, 135 Colo. 575, 577, 313 P.2d 998, 999 (1957).

25.    Shilliday should never have filed a R. 210 Motion to **accelerate** the Sale, **not** Stay it, as requested, without notice or further LR 7.1(a) conferral following her June 16 e-mail (Ex. II). See *Hoelzel v. First Select Corp.*, 214 F.R.D. 634, 635-36 (D. Colo. 2003) Any motion that is not supported by proper conferral consistent with L.R7.1(a) will be summarily denied. *Smith v. Craven*, 2014 U.S. Dist. LEXIS 92440 (D. Col. 2014) *Cf. Connolly v. Toll Brothers, Inc*.,  2015 U.S. Dist. LEXIS 65401, 2015 WL 2345639, at *1 (D. Col. 2015) ("a single email, letter, or voicemail, without any follow-up, ordinarily does not constitute a good faith effort to confer); *Lewis v. Circuit City Stores, Inc*., 500 F.3d 1140, 1153 (10th Cir.2007) (federal courts have inherent powers to levy sanctions in response to abusive litigation practices). Failure to comply with L.R 7.1(a) is sufficient grounds, standing alone, on which to deny a motion. *Allen v. Wal-Mart Stores, Inc*., 2021 U.S. Dist. LEXIS 171804, 2021 WL 4133914, at 3 (D. Col. 2021) See also, *Shrader v. Biddinger*, 633 F.3d 1235, 1249 (10th Cir. 2011)

26.    Nonetheless, hoping to resolve the improper R. 120 filing without further expenditure of his professional time or further involvement of the Court, the Undersigned <u>continued</u> to confer with Shilliday, on both July 11 and 12, 2022, (Ex. X) proposing, in pertinent part:

I suggest taking the time to retrieve and examine the full file from BOA and review history here, before attempting to challenge the removal, because doing so will only necessitate and compel us to amend our pleading and docket a Third Party Complaint against both Bank of America, you individually, and your firm, McCarthy Holthus in the US District Court for lender and attorney fraud, with this email chain being **Exhibit A** to that Complaint.

Those two choices are:

I.    **a) Agree to Remove and Stay all Public Trustee Sale proceedings re: the Property until further order of the District Court in Case No. 22-Cv-00930** (*which is exactly what I discussed and attempted to seek consent from Ms. Dell'Acqua for during our Meet and Confer on June 16, 2022 and which I was professionally compelled and obligated to do under D. Co. Local Rule 7.1(a)*)); and

**b) Voluntarily withdraw the pending Rule 120 Notice, so I do not need to file a motion to strike it and for sanctions, which I intend to do unless this occurs.** The entire R. 120 Case should <u>never</u> have been docketed following our conferral without disclosing in advance that you planned to do so, instead of sending me the false and misleading June 16, 2022 email below which advises of none of what you planned to do. Under the rules of professional conduct, you owe me, as an attorney and opposing litigant a duty of candor, honesty, and fairness at all times. The moment you deviated from the representations you made in your email below on June 16, you were obligated to correct those representations and inform me of what you were planning to do/did. But you did neither – and that was clearly intentional. I had to discover your surreptitious Rule 120 filing and its accelerated July 27 deadline myself. ---- so I'm pretty sure the Court will not look too kindly upon a R. 120 state court action that Your Firm and BOA raced to the state courthouse to file in the midst of federal court proceedings regarding the Property after I informed Ms. Dell'Acqua of the primacy of the federal case, that BOA had nothing filed or served and the wrong parties named in your defective Notice recorded on March 17, 2022, and that I was going to file a motion to stay all such Public Trustee activities during our required federal district court conferral per LR. 7.1(a)); and

**c) Voluntarily agree to pay $5,000 plus the actual costs of Removal ($402 fed, $128 state), without the necessity of me having to file a motion for sanctions** to compensate me for my professional time and expense dealing with the consequences of your unprofessionalism and fraud; and then

**d) Simply do nothing await the further order of Court.** Neither your firm or BOA needs to do anything to get paid in full here. BOA is already fully secured and collateralized on its Note by 5:1, and a <u>LTV of less than 20%</u> based on the amount stated in your March 17, 2022 Notice**.**

Or, Alternatively

II.    a)    **Challenge the Removal and refuse to consent to a stay,** and this email chain will be Exhibit A of Plaintiffs' response; and if so,
b)    **Bank of America (and you) will quickly find themselves named as defendants in a Third Party Complaint, relative to longstanding Lender and Attorney Fraud Litigation regarding 460 El Mirador, Edwards, Colorado.** I won't delve too much of that yet, but the facts will be readily apparent once you review BOA's file, and they will be set forth in detail in our Third Party Complaint. For example, did you know that a

9

27.     Indeed, the fact that BOA has done neither in response to this July 12 conferral e-mail, and instead recently docketed a Motion for Remand (D.12) is penultimate evidence of Bank of America's intent to take the Property for itself by obtain ownership of the Property by <u>nonjudicial</u> means.

28.     *Still* hoping to resolve the matter without further expenditure of professional time or further involvement of this Honorable Court, the Undersigned continued to confer with Shilliday in **three further** conferral e-mail requests on July 12, 13 and July 15, 2022 (Id.) See Exhibit X. [7]

29.     Critically, however, Shilliday did not respond to *even one* of the Undersigned's three further conferral e-mail requests on July 12, 13 and July 15, 2022 (Id.) See <u>Exhibit X</u>

30.     Instead, Shilliday sent this on August 4, 2022 (Ex. Y), which the Undersigned never saw because he was hospitalized with a spinal infection (Ex. Z)

> "We intend to file a motion for remand as Rule 120 proceedings are not removable. I mentioned this in an earlier e-mail but did not hear from you. May I please inform the Court regarding your position on the motion. Are you willing to consent to the relief requested?"

31.     In acting as aforesaid, Shilliday patently abused and violated this District Court's Local Rule 7.1(a). The rule <u>requires</u> counsel to attempt "to resolve any disputed matter." This means that counsel must engage in "<u>meaningful negotiations</u>." (Rule 7.1(a) "is not satisfied by one party sending a single e-mail [, letter, or voice message] to another party"). *Hoelzel v. First Select Corp.*, 214 F.R.D. 634, 635-36 (D. Colo. 2003) [8]

---

[7] The Undersigned was hoping to avoid the necessity of incurring the additional 79 hours of his professional time ($780/hr) which it took to draft the instant Complaint, Motion to Dismiss, Motion for Sanctions and Response to BOA's Motion for Remand (D.12)

[8] Shilliday did call the undersigned on Saturday August 6, 202, and in a call that lasted 1-2 minutes she was informed that the Undersigned had not seen her email, was hospitalized with a severe infection, and was still awaiting her response to his conferral emails from mid-July requesting voluntary withdrawal and dismissal of the improper R. 120 filing and a check for his before docketing counterclaims and third party claims against BOA and moving for sanctions, but which Shilliday had never responded to.

32.     Shilliday also intentionally deceived an opposing party and fellow member of the bar, by engaging in deceptive and abusive collection and litigation ploys designed to accelerate non-judicial sale proceedings and prejudice Yajia and Mark's rights, contract claims and defenses, and rights to notice and due process.

33.     Indeed, we know that Bank of America wants the Property by nonjudicial means is that instead of staying back and waiting to be paid on its 6x overcollateralized position, as the Undersigned proposed during conferral (Ex. X).

34.     Instead, Shilliday and Bank of America remain steadfast and intransigent in their untenable and legally indefensible position.

35.     This R. 120 action should <u>never</u> have been docketed in the first place and the Undersigned should not have been forced to expend his professional time and energy – <u>while infirmed and hospitalized</u> - to rectify this situation and have to respond to Shilliday and Bank of America's Motion for Remand (D.12)

36.     Given Shilliday and Bank of America's patent abuse Local Rule 7.1(a) and Duty To Confer and willful deception of the Undersigned and buy time to rush to the State Courthouse to do the very things the Undersigned sought her and Bank of America's consent <u>not</u> to do – and which they had no right to do given the primacy of first-filed federal judicial proceedings and exclusive subject matter and in personam jurisdiction over the Property and Parties with competing claims against it – which Shilliday cannot claim ignorance of. See 'Exhibit 3 to Verified R. 120 Motion', reciting D. Col. 22-Cv-00930's service list practically *verbatim*; (Ex. AA)

37.     Astoundingly, this R. 120 action was docketed by BOA not only in bad faith by unethical and deceptive means by its Counsel towards an opposing litigant and a fellow member of the bar following good faith L.R Rule 7.1(a) conferral in District Court Case 22-Cv-00930, but also

in knowing contravention of controlling legal authority and the Priority Rule requiring that it be stayed, dismissed, or consolidated. *Town of Minturn v. Sensible Housing Co.*, 2012 CO 23, 273 P.3d 1154 (2012)

38.    But for Bank of America and Shilliday's calculated and willful violation of these duties and clearly harassing deceptive and abusive collection and litigation ploy of docketing a R. 120 action designed to accelerate non-judicial sale proceedings to harass and prejudice Yajia and Mark's rights, contract claims and defenses, and rights to notice and due process, and doing so without meaningful conferral, and notwithstanding awareness of the primacy and earlier pendency of first-filed federal judicial proceedings with exclusive jurisdiction over the Property, the Undersigned would not have needed to expend his professional time and involve the Court with the instant Complaint, Motion to Dismiss, Motion for Sanctions and Response to BOA's Motion for Remand (D.12)

39.    Under these circumstances, an award of $76,050 in fees and $880 in costs is warranted as sanctions under R. 11. and pursuant to the relief afforded for such violations under the Federal Fair Debt Collection Practices Act, 15 U.S. Code § 1692f [9]

40.    To hold otherwise would unjustly reward Bank of America for its abuse of the District's Local Rule 7.1(a) to disadvantage parties and claims previously pending in a sister case in this same District.

---

[9] Under penalty of perjury, I affirm that I am an attorney for nearly 30 years, a member of the federal bar and admitted in a number of states. My usual and customary billing rate is $780/hr. To date, I have incurred 18.5 hrs. between 6/16/22 and 7/11/22 on removal & conferral, and 79 hours on this matter since, plus filing fees of $402, $128, and $350, none of which would have been incurred had Shilliday and BOA agreed to withdraw their improper R. 120 filing and consented to stay such during the pendency of 22-Cv-00930, as requested, on June 16, 2022

## II.    PARTIES, JURISDICTION (28 U.S.C. §1332), VENUE

14.    Under 28 U.S.C. § 1332(a), the "[t]he district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between…citizens of different states."

15.    Here, the United States District Court for the District of Colorado has original jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the Plaintiff and all **Defendants are completely diverse**, and the amount in controversy exceeds $75,000.00.[10]

16.    Plaintiff/Counter-defendant, Bank of America, N.A is an American multinational investment bank and financial services holding company headquartered in North Carolina with its principal place of business in North Carolina and is thus a citizen of **North Carolina.**

17.    Defendant Wendy R. Schwartz ("Wendy") was either erroneously or deceptively noticed and named as a party to conceal the identity and avoid noticing the real party in interest - Yajia's Trust.[11]    Notwithstanding, for purposes of diversity jurisdiction, Wendy R. Schwartz is a resident and citizen of **Illinois.**

18.    Defendant/Counter-Plaintiff Mark A. Schwartz is a resident and citizen of **Puerto**

---

[10] Diversity of citizenship requires that each plaintiff be a domiciliary of a different state from each defendant. See, e.g., *Salt Lake Tribune Pub. Co., LLC v. AT&T Corporation*, F.3d 1081, 1096 (10th Cir. 2003). For purposes of federal diversity jurisdiction, an individual's state citizenship is equivalent to domicile. *Crowley v. 1260 Glaze*, 710 F.2d 676, 678 (10th Cir.1983). *Smith v. Cummings*, 445 F.3d 1254, 1259–60 (10th Cir. 2006). Evidence of domicile includes "where a party receives mail." See *Alpine Bank v. Hubbell*, Case No. 05–CV– 26, 2008 WL 4080003, at 3 (D.Colo. Sept. 2, 2008). Domicile, in the context of legal entities, is generally determined by where the entity is incorporated, registered, or has its principal place of business. See, e.g., *MacGinnitie v. Hobbs Group, LLC*, 420 F.3d 1234, 1239 (11th Cir. 2005) courts permit the introduction of evidence extrinsic to the complaint in order to demonstrate that the requirements for diversity jurisdiction are met. See, e.g., *Nichols v. Golden Rule Ins. Co.*, 2010 WL 1769742, at 4 (D. Colo. 2010). Both of the Defendants herein are trusts. According to *Americold Realty Trust v. Conagra Foods, Inc*., 577 U.S. 378, 383-84 (2016), the citizenship of a trust which is not considered a separate legal entity pursuant to state law (which is the default status of any trust) is the citizenship of its trustee(s).

[11] Critically, Wendy had **no** right, title, or interest in the Property since March 30, 2007. She transferred and disclaimed her entire interest in the Property by quit claim deed to Mark's Trust over 15 years ago, in 2007 (Ex. G) and reaffirmed that transfer again by quit claim deed again 6 years ago in June 2016 after she and Mark divorced. (Ex. H) Nor is Wendy liable on the debt or Note at issue. (Ex. A). Wendy was **never a maker, signer, or party** on the Note. (Id.)

**Rico**. Mark is also the Trustee of the Axis Investment Holdings Trust, which was formerly known as the Mark Alan Schwartz Revocable Living Trust No. 1 ("Mark's Trust). Although not named or noticed by Bank of America, Mark's Trust was the prior Record Title Owner of the Property prior to the Yajia Hu Schwartz Revocable Living Trust. Mark's Trust is not separate legal entity. Mark administers and manages his Trust in Puerto Rico out of his home in Puerto Rico where Mark  has been an official resident and Puerto Rico citizen since permanently relocating there with Yajia and their son in 2015.  As such, Mark's Trust's principal place of business is in Puerto Rico and is a resident and citizen of **Puerto Rico**.

19.     Third Party Plaintiff, Yajia Hu Schwartz is a resident and citizen of Puerto Rico. She is also the Trustee of the Yajia Hu Schwartz Revocable Living Trust. Although not named herein, Third Party Plaintiff the Yajia Hu Schwartz Revocable Living Trust ("Yajia's Trust") is **the Record Title Owner of the Property**. Yajia's Trust is not separate legal entity. Yajia administers and manages her Trust in Puerto Rico out of her home in Puerto Rico where Yajia has been an official resident and Puerto Rico citizen since permanently relocating there with Mark  and their son in 2015.  As such, Yajia's Trust's principal place of business is in Puerto Rico and is a resident and citizen of **Puerto Rico**.

20.     The Public Trustee's Office of Eagle County, Colorado is disregarded in this analysis as it is merely a nominal and formal party and not a party with any interest in the outcome of the State Court Case and controversy.[12]  Notwithstanding, the Public Trustee's Office of Eagle County, Colorado it is a citizen of **Colorado** for purposes of diversity jurisdiction. [13]

---

[12] See, *Navarro Sav. Ass'n v. Lee*, 446 U.S. 458, 460-61 (1980) ("[A] federal court must disregard nominal or formal parties and rest jurisdiction only upon the citizenship of real parties to the controversy.")

[13] See *Moor v. Alameda County*, 411 U.S. 693, 717 (1973) ("[A] political subdivision of a State … is a citizen of the State for diversity purposes.").

21.     In addition to the foregoing, the amount in controversy exceeds $75,000.00, as Bank Of America's R. 120 Complaint and Notice of Election and Demand recorded 3/17/2022 attached thereto, facially claims Bank of America is owed in excess of $659,776.76 in principal plus interest and other charges amounting to $222,708.35 of April 2022 (Ex. Q), plus foreclosure fees and recording charges, both of which are disputed as fraudulent herein, and seeks to liquidate a Property valued at $3,860,000 to satisfy this claimed debt which is disputed

22.     Because plaintiffs and defendants are completely diverse and the amount in controversy exceeds $75,000.00, this Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332.

23.     This Court has jurisdiction over the subject matter of this dispute and the parties because the subject Property is located in Colorado, and the Note and Deed of Trust were drafted and executed in Colorado. Further, this Court has jurisdiction over the subject matter of this dispute and the parties because and a substantial part of the transactions, occurrences, files, and witnesses at issue in this lawsuit transpired in Colorado and are located in Colorado.

24.     This Court also has jurisdiction over the subject matter of this dispute which involves alleged violations of the Federal Fair Debt Collection Practices Act as well as Colorado's Federal Fair Debt Collection Practices Act.

25.     Finally, this Court has jurisdiction over the parties. This Court has personal jurisdiction over Defendant pursuant to the Colorado Constitution, the Constitution of the United States, and Colorado's long-arm statute, because the Defendants purposefully directed their activities at Colorado, and this cause of action arises out of and relate to Defendants' contacts with Colorado and further, this Court's exercise of personal jurisdiction over Defendant comports with traditional notions of fair play and substantial justice.

26.     Venue is appropriate in this Court in the State of Colorado, under 28 U.S.C §

1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this

judicial district and because both the Property and a substantial part of the transactions & events or

omissions giving rise to the claims occurred in Colorado in this District.

### III.     PROCEDURAL HISTORY AND REMOVAL REQUIREMENTS SATISFIED

27.     On April 18, 2022, Third Party Plaintiff, Yajia Hu Schwartz, Individually and as

Trustee of the Yajia Hu Schwartz Revocable Living Trust docketed USDC Case No. 22-Cv-

00930, seeking, inter-alia, to marshal competing liens, claims and interests together in one

proceeding to seek contractual performance and quiet title with respect to the subject Property due

to litigants' competing interests and claims to it, including the mortgage interest claimed by Bank

of America.

28.     On June 29, 2022, notwithstanding the primacy and exclusive jurisdiction of USDC

Case No. 22-Cv-00930 over the subject *res* and Property, Bank of America, via Shilliday,

surreptitiously raced to Eagle County, Colorado, District Court to a Rule 120  Action, No.

2022CV30120, ("State Court Action") to **accelerate** the Property's sale, after intentionally

deceiving the Undersigned otherwise during and following the Undersigned's good faith LR 7.1

conferral with Shilliday and Dell'Acqua on June 16, 2022 in respect to his Motion to Stay and

enjoin any non-judicial proceedings or sale of the Property during the pendency of USDC Case

No. 22-Cv-00930 (Ex. X).

29.     Removal to the Proper Court.  Counter-Plaintiffs  promptly removed Bank of

America's State Court Action to the proper court, which is this United States District Court of

Colorado ("Federal Court"), Case No. 22-1764 , pursuant to 28 U.S.C. §§ 1332, 1441 and 1446.

Removal to this Court was proper because it is part  of  the  "district  and  division" embracing

the place where this action was filed—District Court, County of Eagle County, Colorado. *See* 28 U.S.C. §§ 1441(a), 1446(a).

30.    Consent of All Other Defendants. No Defendant or Trustee of any Defendant has been served in the State Court Case. Nor has Yajia's Trust, the Record Title Owner of the Property been named or served in the State Court Case. Nevertheless, all named Defendants herein, as well as the Record Title Owner, the Yajia Hu Revocable Trust, and its Trustee Yajia Hu Schwartz, consent to removal. Consent of the Eagle County, Colorado Public Trustee is not required because it is a as a formal or unnecessary party is therefore disregarded in this analysis. [14]

31.    Removal was Timely. Removal was timely as there has been no service in the State Court Case. As such, the 30-day removal period never began to run 28 U.S.C. § 1446(b).

32.    Pleadings and Process. The Complaint and documents filed in the State Court Case were attached to the Defendant-Counter-plaintiffs' Notice of Removal  28 U.S.C. § 1446(a) and they paid the appropriate filing fee to the Clerk of this Court upon the filing of this Notice of Removal.

33.    Notice. In compliance with 28 U.S.C. § 1446(d), Plaintiffs promptly: (a) served a Notice of Removal upon all adverse parties; and (b) filed a copy of the Notice of Removal with the clerk of the State Court.

34.    Signature. The Notice of Removal was signed pursuant to Fed. R. Civ. P. 11. 28 U.S.C. § 1446(a). Based on the foregoing, this Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a), and removal to this Court under 28 U.S.C. §§ 1441 and 1446 is proper.

---

[14] See *Penson Financial Services, Inc. v. Golden Summit Investors Group, Ltd.*, 2012 WL 2680667, at 6 (N.D. Tex.) (recognizing an exception "to the 'rule of unanimity' for effecting removal where a defendant is merely a nominal, unnecessary or formal party-defendant")

## IV.     RELEVANT  FACTS

### A.  Introduction:

35.     The Property at issue in these proceedings a unique, irreplaceable, income-producing asset. (USDC  Case No. 22-Cv-00930, D.26, ¶1)

36.     Located near Vail and Beaver Creek, the 7,800 sq. ft estate home spans two acres and has panoramic mountain views. It was custom built and designed by an artist, is located on a ridge, next to a sledding hill and a trailhead with access to hundreds of miles of national forest hiking trails.  (Id.)

37.     The Property has been under Yajia's sole ownership, management and control since August 2019 as a high-end vacation and destination wedding venue. (Id.)

38.     Under Yajia's management and control, the Property generates approximately $250,000 in revenue annually.

39.     Each of the parties named in first-filed USDC Case No. 22-Cv-00930 filed on April 18, 2022, claims certain rights, title, and interests in and with respect to the subject Property that are averse to the rights, title and interests asserted by other parties named therein.

40.     Specifically, this removed Rule 120 Application, now pending in this District Court of Colorado Case No. 22-1764, claims a mortgage lien interest in the subject Property, secured by a Deed of Trust with a Power of Sale, and seeks to auction off the Property at Public Trustees Sale.

41.     However, if permitted, this would result in the permanent loss of the Property and immediately extinguish all rights title and interests of the other parties to the Property and presently before the court in the first-filed USDC Case No. 22-Cv-00930, which already possessed exclusive jurisdiction over the subject Property, prior to Bank of America's race to the Courthouse on June 29,

2022, to docket this Rule 120 action.

42.  For this reason, and violations of this Court's Local Rules, it should *never* have been docketed.

43.  Without this Honorable Court's urgent intervention, Yajia stands to forfeit both her profit from the Adams sale and also the Property itself, if Bank of America gets its way, a unique, irreplaceable, income-producing asset, essential for Yajia's livelihood, which generates $250,000 in revenue annually.

44.  In view of the foregoing, to preserve the status quo and avoid irreparable harm to the Parties and the Property during the pendency of these proceedings motion, Yajia will be moving to urgently strike, dismiss, stay this case in response to Bank of America's Motion to remand it.  That Motion will follow shortly.

**B. Relevant Background Information:**

45.  By way of background, Yajia is a naturalized US citizen who was born in rural China to parents who met while interred at a work/re-education camp.  Yajia experienced abject poverty, even starvation as a child. Fortunately, Yajia was gifted both linguistically and mathematically and was able to test into a baccalaureate program that enabled her to attend university, where Yajia later earned degrees in accounting and finance.

46.  Determined to never be that hungry or that poor again, Yajia purchased her first two rental properties at the age of twenty-five.  Her success as a "*landlord lady*" with those rentals inspired Yajia to pursue her career in property management.  After college, Yajia worked at a real estate management firm in Orlando, Florida for a year. (http://cameronkuhn.com).

47.  In 2007 Yajia met Mark. In 2008, she interned at Mark's former company, Axis

Capital Management, Inc. ("Axis"). In 2009, Yajia accepted a full time real estate portfolio management, servicing, and analytics position at Axis where Yajia managed hundreds of REO properties from diligence & acquisition to lease, sale, or other disposition for Axis and its institutional clients.

48.    In 2009, Yajia and Mark entered into a common law marriage together, holding themselves out as husband and wife, with Yajia managing all aspects of their joint household and personal financial affairs and assets, including, the Property.

49.    By 2012, during the pendency of Mark's divorce, Yajia and Mark decided to start a family together, but Mark's was still trying to get a divorce, and they were advised that due to a defect in Yajia's birth canal and Mark's history of prostate cancer, both would need to undergo surgery if they wanted to produce embryos that Yajia could safely carry to term. These Family Planning, Medical, and Marital Estate issues prompted Mark to finalize his estate plan and execute a number of estate planning documents in August 2012, to formally document their common law marriage and union and intent to gift over and convey a beneficial interest in his entire Marital Trust Estate to Yajia, whom he was unable to marry while his divorce was pending. Critically, in August 2012, Mark amended both his Will and the Axis Investment Holdings Trust, making Yajia its primary beneficiary, heir, and trustee over all of the Trust's assets, including the Property.

50.    At that point in time, Yajia became a third party beneficiary under Mark's the loan agreement with Bank of America as having a beneficial ownership interest in the Property.

51.    The year before in 2011, the Property appraised at $1.8M. In 2014 the Property was re-appraised even lower at $1.75M. In 2014, Mark listed the Property for sale at $2.95M, the amount of the mortgages.  In 2015, Yajia and Mark moved to Puerto Rico.

52.    Between 2009 until 2016, while Mark was busy with two new start-up businesses,

one in Maryland involving Eagle Bank which he started in 2013, and the other, a medical startup in Puerto Rico, Yajia managed all aspects of their joint financial affairs – including the Property

53.  Mark's Marital Trust Estate's equity in the Property had been "negative" and "underwater" for many years - worth far less than the $3M in loans Mark took out against the Property between 2003-2007 to capitalize Axis. [15]

54.  In 2011, one year before Mark made Yajia the primary beneficiary of his Marital Trust Estate, and the vested beneficial owner of the Property, it was valued by appraisal at only $1.8M. In 2013, Axis relocated its business to Maryland, after Mark secured a REO lending commitment from Eagle Bank, which Mark, his Trust, and his lawfirm TLLG offered to guaranty. In 2014 the Property appraised even lower than it had in 2011, at only $1.75M Nevertheless, Mark listed the Property for sale in 2014 for $2.95M, the amount his Axis Holdings Trust needed to pay off the mortgages that capitalized Axis.

55.  In 2015, Yajia and Mark relocated permanently to Puerto Rico, leaving the Property in which they had been residing together, not only for languishing on the market due to its being "underwater" equity-wise, but also largely unused and unoccupied after their move.

56.  By the time Mark's divorce finally ended in 2016 and the couple married, the Property in which they had been living in and residing in together as common law husband and wife since 2013 had been listed for sale for nearly three years at 2.95M, with no offers.

57.  In August 2019, Mark wanted to relist the Property, but was advised by his broker that the area comps would not support the 2.95M sales price his Trust needed to pay off the mortgages.

---

[15] Yajia and Mark eventually married in July 2016, after Mark's divorce was finalized.

58.    It was at this time, in August 2019 that Yajia approached Mark with her idea to have her take title to the Property via her Marital Trust (in which Mark was primary beneficiary) as an owner-operator, subject to the mortgages, and convert it to full-time use as a high-end Airbnb/Vrbo vacation rental and destination wedding venue, a business which she had been running and improving since she took over full time management of the Property a decade earlier, in 2009.[16]

59.    In late August of 2019, Mark agreed to convey the Property from his Marital Trust to Yajia's Marital Trust, drafted the deed to do so, and Yajia immediately went to work implementing the conversion, hiring additional cleaning and maintenance personnel, replacing old furniture and equipment, and revamping her online advertising message.[17]

60.    As evidenced and confirmed by Yajia's bank and Airbnb/Vrbo statements, Yajia's results in doing so were both immediate and stellar.   (Ex. M)

61.    Since August 2019, Yajia succeed in converting the Property into a high-end Airbnb/Vrbo vacation rental and destination wedding venue, managing it as "Super Host, and generating approximately $20,000 per month doing so. Yajia's banking statements  also confirm that Yajia continued to use the income it generated towards taxes, insurance, utilities, debt service, repairs, maintenance, etc. for the Property, to pay college tuition at Boulder for Mark's son, and for their shared household and living expenses.  (Ex. M)

62.    Not coincidentally, it was also at this same time, in late August of 2019 that Yajia

---

[16] The income Yajia generated would continue to be used towards taxes, insurance, utilities, debt service, repairs, maintenance, etc. for the Property, college tuition for Mark's son, and their shared household expenses just as Yajia had been doing for over decade, and during which time Yajia continually re-invested the income she was generating through her rental business back into the Property. And in August 2020, after two mechanical systems failed Yajia borrowed $14,000 from her parents to replace them.

[17] Mark actually drafted the Quit Claim Deed in August 2019, along with other business and estate planning documents which required a notary, but due to litigation involving his Puerto Rico start-up, Mark was unable have it notarized in Puerto Rico until October 2020, due to the Covid-19 pandemic, when all notaries and other businesses were closed by governmental order. Similarly, due to the pandemic and pre-existing medical issues, Mark was unable to travel to Colorado to record the transfer until May 2021, after receiving his second vaccination shot.

and Mark sought a loan modification with Bank of America, with <u>Yajia offering to become an</u> <u>additional co-borrower on the Note in light of her impending ownership and takeover of the</u> <u>Property from Mark's Trust</u> – which Bank of America was made aware of in August 2019 by and through their written submissions and communications to BOA's representatives at that time. (Ex. I) Yajia and Mark provided Bank of America with this information in good faith, erroneously believing it would use the information to help them, not take advantage of them. (Ex. I, L, P, M).

**C. Bank of America Loan History**

63.    In June 2003, Mark A. Schwartz, ("Mark") as Trustee and Grantor of the Mark Alan Schwartz Revocable Living Trust Number One ("Trust"), a private high net worth client of Bank of America for many years, negotiated and obtained a $1M *personal* loan from Bank of America to help him finance his Trust's acquisition of subject Property, located at 460 El Mirador, Edwards, Colorado, 81632, (the "Property") as evidenced by a Note (Ex. A), Deed of Trust (Ex. B), Settlement Statement (Ex. C), Federal Truth In Lending Statement (Ex. D), Escrow Account Disclosure Statement (Ex. E), and Cover Letter (Ex. F), specifying a fixed monthly payment of principal and interest of $5,835.73 over the loan term with <u>no</u> escrow or forced payments for insurance and taxes specified therein.

64.    Critically, Wendy R. Schwartz ("Wendy"), Mark's former spouse, has **no** liability on the debt or Note at issue in its Rule 120 Action. Even a casual inspection of the nearly 20 year old Note at issue reveals that Wendy was never a maker, signer, or party to that Note – only Mark (Ex. A).  Likewise, Wendy has **no** right, title, or ownership interest in the Property for over 15 years. On March 30, 2007, Wendy disclaimed and transferred her interest by Deed recorded April 5,

2007, in Eagle County Doc. No. 200708828 (Ex. G). [18]

65.    On June 27, 2016, Wendy again reaffirmed that she had **no** right, title, or ownership interest in the Property – following her divorce from Mark more than 6 years ago. (Ex. H)

**D.  In August 2019, Mark & Yajia Request Mortgage Assistance For Temporary Hardship**

66.    On August 21, 2019, Yajia and Mark requested mortgage assistance from Bank of America assistance due to financial hardship (Ex. I ).

67.    This was the first of three such requests, all of which were denied without good reason or cause, and contrary to its underwriting and its mortgage assistance guidelines, as will be further evident following discovery.  (Ex. I, L, P, M)

68.    There was no reason to refuse to remove Wendy as a 'co-borrower' when she had no liability on the Note.

69.    There was no reason to refuse the additional security of adding a true co-borrower, Yajia, a real estate, accounting, and finance professional with an interest in the Property since 2009 and an immaculate credit history. (Ex. I, L, P, M)

70.    Likewise, there was no reason to refuse to lower the rate or extend the term of a Note where Bank of America was already over-secured by a Factor of 6x and with a 17% LTV! (659,776/3,860,000=.17) when there was no risk of nonpayment by all objective measures based upon either the Property's value or by its documented income sufficient to cover its annual debt service, insurance, and taxes by Factor of 3x!  (Ex. I, L, P, M)

71.    As of August 21, 2019, Bank of America had not yet imposed additional charges and escrow payments in connection with its forced place insurance and billing scheme. (Ex. J)

---

[18] Wendy was only briefly in title in 2003 (and again in 2007) – just long enough to contractually waive statutory homestead rights as required by Par 24 of the DOT, as she did again in 2007 in connection with the closing of the Property's 2nd mortgage with Countrywide for $1.85M.

**E.  Bank Of America's Sham Forced Placed Insurance Scheme**

72.    Unbeknownst to Yajia and Mark at that time, Bank of America initiated a sham forced placed insurance scheme on or about June 2020 when Bank of America unilaterally increased the loan's fixed monthly payment amount by 33%, from $5,875.33 to $9,204.33. (Ex. K)

73.    Bank of America did this while Yajia and Mark's request for mortgage assistance was still under review, using Yajia and Mark's good faith disclosure that without the modification they had been seeking since August 2019, they would be unable to afford to renew their existing policy with Chubb without such Mortgage Assistance as its annual premium had  doubled in June 2020 to nearly $13,000 from $5,800 for the $5,000,000 of coverage that Bank of America was insisting upon.

74.    By the time Yajia and Mark discovered that Bank of America had *'purchased'* this so-called *'insurance'*, Bank of America informed them that it could not be reversed - the placement was irrevocable – such that even if Yajia and Mark obtained replacement insurance prior to its expiry in June 2021, that Bank of America would not issue and refund for the 'insurance' they claim they purchased in June 2020 – but which Bank of America steadfastly refused to even provide copies of,  or online access to - even to this day – (Ex. N) because the whole scheme was a rouse and a sham from the get-go, designed to line Bank of America's pockets and increase their hardship, not help with it.

75.    On information and belief,  Bank of America's 'forced place insurance' either never existed at all, or if it did exist – which is doubtful – it only covered Bank of America against loss - not Yajia and Mark.

76.    Moreover, even after Yajia and Mark obtained the $5,000,000 in coverage demanded by Bank of America before June 2021, (Ex. O) Bank of America refused to honor it –

claiming it was not acceptable to them, and so once again, Bank of America issued another forced placed policy for itself in June 2021.(Ex. BB)

77.     In sum, Bank of Americas fraudulent forced place insurance scheme increased the loan's fixed monthly debt service amount by 33%, from $5,875.33 to $9,204.33, thereby increasing, not reducing, its customer's hardship by a quarter million dollars ($222,708.35) as of April 2022 (Ex. Q).

78.     Bank of America's forced place insurance scheme was a complete fraud and sham.

79.     Even if real, the charges imposed were wholly inflated, and unrelated to any meaningful benefit or reciprocal value conveyed.

80.     Even if real, Bank of America was not acting in good faith in imposing it, as Bank of America's clear was to increase their clients hardship and risk of default, while increase Bank of America's financial leverage and position in the asset.

81.     Even if real, the "forced placed insurance and escrow scheme' was in breach of the original loan documents (Ex. D) and 16 years' of documented loan history.

**F.  Yajia and Mark Continue To Request Mortgage Assistance in 2020 and 2021:**

82.     On November 14, 2020, Yajia and Mark continued to request mortgage assistance from Bank of America assistance due to financial hardship (Ex. L) even while the forced insurance scheme was ongoing. This was the second of three such requests, all of which were ignored and thus denied without good reason or cause, and on information and belief, entirely contrary to its underwriting and its mortgage assistance guidelines, as will be evidenced by discovery of its underwriting guidelines and file with respect to this mortgage, and for the reasons set forth above.

83.     Critically, accompanying this second request for assistance was a printout of the Property  revenue Yajia was generating on Airbnb, Vrbo and privately by after she converted the

Property for full time use as a high-end vacation and destination wedding venue in August 2019. (Ex. M)

84.    On January 14, 2021, Yajia and Mark again requested mortgage assistance from Bank of America assistance due to financial hardship (Ex. P).  This was the third of three such requests, similarly, ignored and denied without good reason or cause, and on information and belief, entirely contrary to its underwriting and its mortgage assistance guidelines, as will be evidenced by discovery of its underwriting guidelines and file with respect to this mortgage.  Also accompanying this third request for assistance were updated printouts showing the monthly Property rental revenue Yajia was generating.

85.    But Bank of America tortiously abused the Property rental revenue information and other documentation that Yajia and Mark supplied in good faith to obtain help and mortgage assistance.

86.    Meanwhile, sometime after their second and third requests for mortgage assistance on November 14, 2020, and January 14, 2021, Bank of America took the additional unethical and punitive step of completely suspending its customer, Mark's online access to his historical mortgage account statements, escrow statements and balances, charges and interest, as well as to his current mortgage statements, mortgage correspondence and important loan Notices from Bank of America. (Ex. N)

87.    On information and belief, Bank of America did this in order to keep Yajia and Mark ignorant and prejudice their informational and consumer loan rights to know and contest its forced placed self-enriching insurance charges and the current status of the mounting interest, penalties, and escrow charges Bank of America had been unilaterally accruing and tacking on to the Note each month since June 2020. (Ex. N)

88.    Bank of America steadfastly refused to reinstate such access.  (Ex. N) Why?

89.    Moreover, Bank of America keeps asking for contact and location information online and over the phone – a violation of the Fair Debt Collection Acts.

90.    In fact, Mark's online access to his mortgage documents, account statements, all Notices, other mortgage correspondence, escrow balance and charges, interest, penalties, and forced placed insurance charges remains suspended and unavailable **even today**. (Ex. N)

91.    Concealing and intentionally blocking, removing, or sequestering access to such information is a clear violation of both the Federal Fair Debt Collection Practices Act and Colorado's Fair Debt Collection Practices Act and highly prejudicial to Yajia and Mark.

92.    For example, due to the suspension of Mark's access to this information, it Yajia and Mark did not discover that Bank of America had unilaterally initiated a forced place insurance and billing scheme to enrich itself at their expense beginning in June 2020 until after it was already placed – and per Bank of America – non-refundable. (Ex. K)

93.    When Yajia and Mark finally discovered what Bank of America had been doing (Ex. K), Bank of America became intransigent and its agents steadfastly refused to back down or adjust the inflated charges, interest, and penalties it had unilaterally added, and awarded to itself, plus interest, even though there were **no claims** made during 2020-2021, nor did Bank of America stop its forced placed insurance scheme in the year that followed, despite the fact that Yajia and Mark supplied Bank of America with proof of insurance in June 2021. (Ex. O)     Rather, Bank of America simply unilaterally on added another $44,000 in fraudulent charges to itself for non-existent insurance again in  2021 – which it also refused to reverse**.** (Ex. BB)

**G.  The Property Goes Under Contract With The Adams For $3,386,000:**

94.    On January 26, 2022,  the Adams submitted binding written contractual offer to

purchase Plaintiffs Property for $3,860,000.

95.     On January 29, 2022, Plaintiff submitted a binding Counterproposal (the "Counter")
to the Adams Offer.  Plaintiff's Counter was mutually accepted and executed by the Adams parties
on January 30, 2022, resulting in a legally binding and mutually enforceable contract.  Mark and his
Trust were 3rd party beneficiaries under that Contract which would pay their mortgage debt, in full,
plus net Yajia's Trust over $800,000, at Closing on April 4, 2022. [19]

## H. BOA Begins Non-Judicial Sale Proceedings <u>The Same Day</u> It Receives An Expedited Payoff Request, And Delays Issuing It Until the Public Trustee Can Complete its File:

96.     Bank of America's counsel, Dell'Acqua drafted and signed a 'Notice of Election and
Demand' (<u>Ex. R</u>), Certificate of Record Owner of the Property pursuant to §38-38-101(g)     (<u>Ex.
CC</u>) and transmitted these along with other documents listed in her Cover Letter to the Eagle County
Public Trustee's Office on March 10, 2022 (Ex.DD) – the <u>same day</u> Bank of America received
Mark's March 10, 2022, Expedited Loan Payoff Request (Ex. S)

97.     Further Bank of America's counsel intentionally delayed responding to Mark's and
the Title Company's Repeated Expedited Payoff Requests (<u>Exs. R, T, U</u>) until March 16, 2022, (Ex.
V)[20].  This was necessary to give the  Public Trustee's office time to complete its file, as can be
readily seen from its document file (<u>Ex. EE</u>) and be ready to promptly record Dell'Acqua's  Notice
of Election and Demand in Eagle County the next morning on March 17, 2022. (<u>Ex. W</u>)

98.     Bank of America's  intention was to obtain title to the  Property by <u>nonjudicial</u>
means, so it could avoid personal service on the record owner, Yajia's Trust,  and avoid dealing with

---

[19] LTGC's Commitment & Settlement Statement required payoff of <u>two</u> old mortgages at closing: <u>Bank of America's
2003 mortgage with $883,524 owed per Bank of America</u> and a 2007 mortgage with $1,878,19 owed by Mark's Trust,
leaving $812,571.80 for Yajia's Trust at closing.

[20] And also, time to fraudulently padding the payoff with $15 in fraudulent recording charges (billing $28 when the cost
was $13) and $2,885 in fraudulent foreclosure fees, incurred only <u>after</u> receipt of an Expedited Payoff Request on March
10th – not before.  (Ex. V)

the contract claims and defenses it knew that Yajia and Mark intended to raise as a result of Bank of America's loan and file history and previous communications with them since August 2019.

99.    Bank of America's fraudulent self-dealing intention was to obtain the Property by non-judicial means because if it wanted to be repaid there would be <u>no reason to start</u> non-judicial sale proceedings upon  receipt of Expedited Payoff Requests (Exs. R, T, U) for a Sale set to close days later on April 4, 2022, nor would there be any reason create a record title exception by doing so which might interfere/delay that closing. (Id.)

100.    Fraudulently, and in bad faith, Bank of America's counsel, purposely waited, delayed, and postponed responding to both Mark's and Yajia's Title Company's Three Expedited Payoff Requests (Ex. S,T, U) until March 16, 2022 (Ex. V) to allow enough time for the Public Trustee to complete its file and appear physically in the Eagle County, Colorado Recorder's Office the next morning at 8:24AM on March 17, 2022, to record the Notice of Election and Demand they had prepared March 10, 2022 (Ex. W)

101.    The only reason Bank of America started non-judicial foreclosure proceedings the day it received an expedited payoff request was to take the Property *without* service on the record owner and without judicial review or any opportunity for Yajia and Mark to appear, answer, and present their claims and defenses on the merits of the action.

102.    Clearly, BOA had already formulated concrete internal plans to take Yajia's Property <u>prior to</u> March 10, 2022, and prior to March 17, 2022.

103.    On March 10, 2022, this file was already at Dell'Acqua and Shilliday's office when Mark Requested an Urgent Loan Payoff on March 10, 2022 – but they had done nothing on it.

104.    The file had been dormant at McCarthy-Holthus as of March 10, 2022. McCarthy Holthus, Dell'Acqua, and Shilliday' had done <u>nothing</u> on it prior to the Payoff Request coming in.

There were no fees due on March 10, 2022, except the bogus foreclosure fees that were surreptitiously added and billed by Dell'Acqua and Shilliday' and McCarthy Holthus after the Expedited Payoff Request came in.

**I.    The Notice And Publication Are Procedurally And Substantively Defective. Neither Was Reasonably Calculated To Provide Notice To The Record Title Owner.**

105.    Bank of America and its Counsel, Dell'Acqua and Shilliday' and McCarthy Holthus were keenly aware that Wendy R Schwartz had nothing to do with the Property for fifteen years or and nothing so do with the Note – ever.

106.    Bank of America and its Counsel, Dell'Acqua and Shilliday' and McCarthy Holthus were also keenly aware that Yajia's Trust was the Property's Record Title Owner when they prepared the Notice of Election and Demand (Ex. W) and accompanying Certificate of Record Owner of the Property pursuant to §38-38-101(g)  (Ex.  CC), signed by Dell'Acqua, and  Certifying that Yajia's Trust was the Record Owner of the Property.  The Public Trustee was also well aware that Yajia's Trust was the Record Owner of the Property – noting it clearly in its file and records (See, Ex. HH)

107.    Yet, while both the Notice and Publication erroneously name Wendy, **neither** names the Record Title Owner – The Yajia Hu Schwartz Revocable Trust, rendering both defective as the name and address of the current owner of the property is not described in the Notice of Election and Demand, in violation of C.R.S. §38-38-101(g):

> (g)  A statement executed by the holder of an evidence of debt, or the attorney for such holder, identifying, to the best knowledge of the person executing such statement, the name and address of the current owner of the property described in the notice of election and demand;  and

108.    Likewise, the Publication is also defective as it also fails to provide the name of the current owner of the Property (Ex. JJ)

31

109.   Further, "Exhibit 3 to Verified R. 120 Motion" is (Ex. AA) intentionally deceptive and misleading as far as Notice is concerned, since the Public Trustee's file confirms that this list was just compiled after conferral, on 6/21/22 – only a week before it this action was but – *after* Publication was complete – *after* recording the Notice of Election and Demand was recorded and thus deceptive and misleading and as far as actual notice is concerned, as it was not part of either the first or second mailings by the trustee (Ex. FF)

110.   Bank of America, Dell'Acqua & Shilliday knew that by recording the NOF on March 17, 2022, it would immediately create a title exception that would interfere, delay, or even upend Yajia's Contract to sell the Property to the Adams for $3,860,000 on April 4, 2022.

111.   Bank of America and Dell'Acqua and Shilliday were already well aware the that the Property was under Contract and set to Close on April 4 from the facsimile communications they had received from Yajia and Mark and Sellers' Title Company LTGC on March 10, March 11, and March 14, 2022 (Exs. S, T, U), respectively, as well as by phone.

112.   Further, on March 23, 2022, Mark reached out to BOA's counsel Dell'Acqua and advised that that the Property was under Contract and set to Close on April 4 and e-mailed her the Adams Contract, a March 16 payoff statement from her client, BOA, and copy of Sellers Title Commitment showing that BOA's mortgage would be satisfied at Closing. (Ex. KK)

113.   The noticing and inclusion of Wendy R Schwartz (a party with no interest in the Property and no liability on its loan) but not the record title holder and real party in interest the Yajia Hu Schwartz Revocable Living Trust in either its Notice of Foreclosure or in this non-judicial R 120 Complaint highlights just how facially procedurally and substantively defective both are, warranting their being struck, dismissed, stayed, and or consolidated with the first-filed federal judicial proceedings in USDC Case No. 22-Cv-00930 pending since April 18, 2022. If dismissed,

Bank of America would be free to intervene and assert its position in that proceeding and would suffer no prejudice by doing so.

## COUNT I
## BREACH OF CONTRACT

114.    All preceding Paragraphs of this Complaint are incorporated herein by reference with the same force and effect as if set forth in full below:

115.    The Loan Documents (Exs. A-F) of Yajia and Mark and those of the Putative Class(es) I-XX were the result of negotiations between highly trained persons, who enjoyed independent legal representation during the process and sufficient resources to seek adequate legal representation, and contained no escrow, insurance, or tax reserve, and/or fixed or adjustable monthly principal and interest payment(s).

116.    The pursuant to the Loan Documents (Exs. A-F), and Bank of America's own Online Services Agreement (Ex. KK), and Deposit Agreement (Ex LL) ("the Contracts") Bank of America and its agents and representatives and attorneys, at all relevant times herein, were contractually obligated at all times  act truthfully, honestly, and in accordance with the terms of those agreements and otherwise obligated to act in a commercially reasonable manner, in good faith at all times, its customers, borrowers, loan applicants, loan customers, and mortgagors, such as Yajia and Mark, and members of Putative Class(es) I-XX in accordance with those agreements, the law, and general standards and regulations applicable to such banks, lenders and mortgagees, at all times, which included not discriminating against them, not defrauding them, not overcharging them, not steal money or property from them, provide timely and accurate account information including statements, notices, account information, itemization and proof of charges, and the rights to access account information and means to dispute the accuracy and/or justification for such charges, if

33

warranted.

117.    Bank of America and its agents and representatives and attorneys breached these

Contract contractual obligations to Yajia and Mark and members of Putative Class(es) I-XX, each a

client, (and together, hereinafter defined as "Client(s)"), in one or more the following ways,

including but not limited to:

1) Not evaluating its clients' applications for mortgage assistance honestly, fairly, and objectively, consistent with standard industry guidelines and its own internal underwriting guidelines.
2) Taking unfair advantage of clients experiencing temporary financial hardship
3) Charging its clients for forced placed mortgage insurance when the loan documents and disclosures did not indicate that its customers would be charged for forced place insurance or charged the amount(s) they were charged, and doing so without their consent, and without any reasonable equivalent value provided
4) Charging its clients for funding involuntary escrow accounts when the loan documents and disclosures did not indicate that its customers would be charged for forced place insurance or charged the amounts
5) Refused to credit, pro-rate, or refund, back-down, otherwise adjust its customers account for forced placed insurance.
6) Unreasonably refusing to accept or credit for insurance obtained by its client after commencement of its forced placed insurance scheme
7) Charging inflated amounts 50%-500% above market rates for forced placed insurance that only protected it, not its clients, and far in excess of its insurable risk of loss.
8) Charging interest and penalties on those inflated amounts
9) Charging for forced placed insurance; it never placed; it never purchased; it never placed in writing; it placed only to itself; or it never provided to its clients.
10) Funding involuntary escrow accounts, thereby increasing the amounts due to it in order to accelerate parking its funds, which its customers were charged interest and penalties on, but were unable to use.  there which were not the charging interest and penalties on funds
11) Charging for involuntary forced place insurance, which either did not exist, or if it did exist, only covered Bank of America, not its customers, and for an amount far in excess of Bank of America's insurable risk of loss, and far below its customers' risk of loss
12) Overcharged for forced place insurance far in excess of the actual market cost of such insurance if placed through independent, arms-length negotiated commercial means, and not in-house, with mark-up charges far of 50%-500%
13) Charged its customers added fraudulent loan, insurance, and foreclosure charges to the Note
14) Acted in bad faith to frustrate/prevent its customers from paying off their loans the value of the property relative to the original principal amount was above a certain threshold.
15) Failed to promptly advise and inform its clients of its mortgage assistance decision
16) Misused and abused information supplied by its customers seeking mortgage assistance

17) Breached its own standards and underwriting guidelines for loan modification when the value of a client's mortgaged property relative to the original principal amount was above a certain threshold

18) Breached industry guidelines and standards for loan modifications for customers when the value of a client's mortgaged property relative to the original principal amount was above a certain threshold

19) Overcharging and Overbilling its clients

20) Imposing a forced placed insurance and escrow scheme contrary to the original loan documents and 16 years' of documented loan history

21) Engaging in practices intended to frustrate or make it more difficult for its customer's to repay their loans

22) engaging in fraudulent and deceptive practices designed to enrich itself at the expense of its customer and the record Property owner so Bank of America could eventually take the Property for itself via a non-judicial process,

23) Blocking customer's access to mortgage statements, letters and notices in its online banking platform.

24) Misleading and lying to client in written and oral communications

25) Engaging in abusive collection practices involving fraud and overbilling.

26) Filing abusive and impermissible legal pleadings in bad faith and for the purpose of harassment and deliberate impairment of their clients rights.

27) Engaging in abusive collection and legal trickery and deceptive tactics designed to accelerate R. 120 non-judicial sale proceedings

28) Engaging in abusive collection and legal tactics upon receipt of payoff statements and otherwise

29) Failing to notify clients and intentionally omitting others entitled to notice of non-judicial proceedings neglecting to include them or their current addresses in letters, notices and publications designed to provide such notice.

30) Engaging in deceptive and abusive collection and litigation ploys designed to accelerate non-judicial sale proceedings and prejudice its client's contract claims and defenses, property rights, and legal due process rights

31) Using unfair and or unconscionable means to attempt to collect a debt, including, but not limited to, the following conduct collection of interest, fees, charges, or expenses not expressly authorized by the loan documents.

32) Misleading clients about mortgage modifications, when, in reality, it was working behind the scenes to move forward with foreclosure

33) Charging improper, or fraudulent fees:

34) Refusing to provide prompt loan payoff information

35) Starting foreclosure when loan payoff is requested to inflate the cost or to prevent loan payoff from occurring

36) Engaging in abusive or deceptive practices to prevent loan payoff from occurring

37) necessary information for loan refinance: Mortgage servicers may fail to provide loan

38) Improper purchase of forced place insurance at inflated cost to inflate the amount of the debt and increase the chances of taking the property.

35

39) Taking actions to force clients into default and to pad and artificially inflate the loan amount
40) Refusing to provide copies of insurance purchased or to supply customers with information about same
41) Refusing to refund unearned premiums. If you ask them for information regarding the insurance they claim was purchased, you'll get nothing.
42) Unlawful foreclosure, by creating circumstances that exacerbated the default and hardship
43) Placing insurance without informing customer
44) Misleading customers about status of modification, while its attorneys moved towards foreclosure auction.
45) Docketing Rule 120 proceedings in bad faith or for the purpose of harassment
46) Filing a Notice of Election and Demand in bad faith when client is attempting to repay loan.
47) Failing to communicate and notify client of its actions
48) Engaging in deceptive practices with its client
49) Sending false and misleading communications and notifications to its clients
50) Taking action to prevent client from receiving timely notices
51) Padding the loan with fraudulent charges to strips the property of its equity
52) Engaging in false, deceptive, or misleading representations or means in connection with the collection of any debt.
53) Falsely representing the legal status of any debt;
54) Using any false representation or deceptive means to attempt to collect a debt.
55) Intentionally using unfair or unconscionable means to attempt to collect a debt;
56) Collection of interest, fees, charges, or expenses incidental to the principal obligation not expressly authorized by the agreement creating the debt
57) Intentionally taking nonjudicial action to effect dispossession of property while feigning and misrepresenting in communications that there was no present to do so;
58) Otherwise breaching its contracts with its clients

**As to Yajia and Mark:**

118.     That as a result of the foregoing, Yajia and Mark have suffered and will continue to suffer contract damages of nearly one quarter million dollars ($222,708.35) as of March 2022 (Ex. Q), subject to increase,  legal fees and costs as of the date of this filing of $76,050 in fees and $880 in costs, also subject to increase, and to place Bank of America on notice that they will suffer further contract damages in the amount of $3,860,000 plus $250,000 in revenue annually should Bank of America succeed in either obtaining ownership of the Property by default at sale or selling the Property at by non-judicial Sale.

119.     WHEREFORE, on behalf of themselves and their respective trusts, Yajia and Mark

PRAY for this Honorable Court to: (a) order Bank of America to approve the modification sought in August 20, 2012 instanter, reinstate the mortgage to active status with outstanding principal balance as of August 21 2019, at the prevailing fixed interest rate of 2.75% in effect on August 21, 2019, to remove/refund all disputed charges, fees, interest, and penalties added since August 21, 2019 (Ex. Q); (b) order Bank of America the Undersigned's legal fees and costs as of the date of this filing of $76,050 and $880, instanter; (c) and if Bank of America should succeed in either obtaining ownership of the Property by default at sale or selling the Property at by non-judicial Sale, order Bank of America to pay them full contract damages of $3,860,000 plus additional contract damages of $8,333,333 for the lost $250,000 in revenue annually at a 3% capitalization rate (250,000/.03 – 8,333,333); (d) order Bank of America to pay the Undersigned a set of reasonable attorneys' fees incurred hereinafter; (e) prejudgment interest; and (f) for all other relief this Court deems proper.

### As to Putative Class(es) I-XX:

120.    That as a result of the foregoing, the other members of the Putative Class(es) I-XX have suffered and will continue to suffer monetary damages with respect to improper charges collected by Bank of America from them or improper charges added by Bank of America to their respective Class Member Notes, and in numerous cases complete loss of their Class Member Properties as and for their contract damages in amount(s) to be determined during discovery, and subject to increase, plus legal fees and costs.

121.    WHEREFORE, on behalf of other members of the Putative Class(es) I-XX, Yajia and Mark PRAY for this Honorable Court to: (a) order Bank of America to them or (or to a general fund established for their benefit)  contract damages in amount(s) to be determined during discovery; (b) plus usual and customary lodestar legal fees; (c) prejudgment interest; and (d) for all other relief this Court deems proper.

**COUNT II**
**MORTGAGE SERVICING FRAUD**

122.    All preceding Paragraphs of this Complaint are incorporated herein by reference with the same force and effect as if set forth in full below:

123.    The Loan Documents (Exs. A-F) of Yajia and Mark and those of the Putative Class(es) I-XX were the result of negotiations between highly trained persons, who enjoyed independent legal representation during the process and sufficient resources to seek adequate legal representation, and contained no escrow, insurance, or tax reserve, and/or fixed or adjustable monthly principal and interest payment(s).

124.    The pursuant to the Loan Documents (Exs. A-F), and Bank of America's own Online Services Agreement (Ex. KK), and Deposit Agreement (Ex LL) ("the Contracts") Bank of America and its agents and representatives and attorneys, at all relevant times herein, owed Yajia and Mark and those of the Putative Class(es) I-XX the following legal duties, including, but not limited, acting at all times, in good faith, truthfully, honestly, fairly and in a commercially reasonable manner towards its Clients, as defined above, in accordance with the terms of their agreements, the law, and general standards and laws and regulations applicable to such banks, lenders and mortgagees, which included not discriminating against them, not defrauding them, not overcharging them, not stealing money or property from them, providing timely and accurate account information including statements, notices, account information, itemization and proof of charges, and the rights to access account information and means to dispute the accuracy and/or justification for such charges, if warranted, and not to tortiously abuse the information collected from them, and who had the right to justifiably relied to their lasting prejudice, detriment, and damage.

38

125.    Notwithstanding the aforesaid duties and obligations, Bank of America and its agents and representatives and attorneys committed dishonest and abusive acts and made fraudulent misrepresentations and intentional material omissions were done intentionally, maliciously, and purposely to deceive and defraud Yajia and Mark and members of Putative Class(es) I-XX, to enrich Bank of America and themselves to the lasting detriment, prejudice and damage of its Clients, in one or more the following ways, including but not limited to intentionally:

1) Deviating from standard industry guidelines and its own internal underwriting guidelines.
2) Taking unfair advantage of clients experiencing temporary financial hardship
3) Charging for forced placed mortgage insurance when the loan documents and disclosures did not indicate that its customers would be charged for forced place insurance, unconscionably overcharged for same, doing so without their consent, and without any reasonable equivalent value provided
4) Charging its clients for funding involuntary escrow accounts when the loan documents and disclosures did not indicate that its customers would be charged for forced place insurance or charged the amounts
5) Refused to credit, pro-rate, or refund, back-down, otherwise adjust its customers account for forced placed insurance.
6) Unreasonably refusing to accept or credit for insurance obtained by its client after commencement of its forced placed insurance scheme
7) Charging inflated amounts 50%-500% above market rates for forced placed insurance that only protected it, not its clients, and far in excess of its insurable risk of loss.
8) Charging interest and penalties on those inflated amounts
9) Charging for forced placed insurance; it never placed; it never purchased; it never placed in writing; it placed only to itself; or it never provided to its clients.
10) Funding involuntary escrow accounts, thereby increasing the amounts due to it in order to accelerate parking its funds, which its customers were charged interest and penalties on, but were unable to use.  there which were not the charging interest and penalties on funds
11) Charging for involuntary forced place insurance, which either did not exist, or if it did exist, only covered Bank of America, not its customers, and for an amount far in excess of Bank of America's insurable risk of loss, and far below its customers' risk of loss
12) Overcharged for forced place insurance far in excess of the actual market cost of such insurance if placed through independent, arms-length negotiated commercial means, and not in-house, with mark-up charges far of 50%-500%
13) Charged its customers added fraudulent loan, insurance, and foreclosure charges to the Note
14) Purposely frustrating or preventing its customers from paying off their loans the value of the property relative to the original principal amount was above a certain threshold.
15) Failed to promptly advise and inform its clients of its mortgage assistance decision

16) Misused and abused information supplied by its customers seeking mortgage assistance
17) Deviation from its own standards and underwriting guidelines for loan modification when the value of a  client's mortgaged property relative to the original principal amount was above a certain threshold
18) Deviating from industry guidelines and standards for loan modifications for customers when the value of a client's  mortgaged property relative to the original principal amount was above a certain threshold
19) Overcharging and Overbilling its clients
20) Imposing a forced placed insurance and escrow scheme contrary to the original loan documents
21) Engaging abusive and deceptive in practices intended to frustrate or make it more difficult for its customer's to repay their loans
22) Engaging  in fraudulent and deceptive practices designed to enrich itself at the expense of its customer and the record Property owner so Bank of America could eventually take the Property for itself via a non-judicial process,
23) Blocking customer's access to mortgage statements, letters and notices in its online banking platform.
24) Misleading and lying to client in written and oral communications
25) Engaging in abusive collection practices involving fraud and overbilling.
26) Filing abusive and impermissible legal pleadings in bad faith and for the purpose of harassment and deliberate impairment of their clients rights.
27) Engaging in abusive collection and legal trickery and deceptive tactics designed to accelerate R. 120 non-judicial sale proceedings
28) Engaging in abusive collection and legal tactics upon receipt of payoff statements and otherwise
29) Failing to notify clients and intentionally omitting others entitled to notice of non-judicial proceedings neglecting to include them or their current addresses in letters, notices and publications designed to provide such notice.
30) Engaging in deceptive and abusive collection and litigation ploys designed to accelerate non-judicial sale proceedings and prejudice its client's contract claims and defenses, property rights, and legal due process rights
31) Using unfair and or unconscionable means to attempt to collect a debt, including, but not limited to, the following conduct collection of interest, fees, charges, or expenses not expressly authorized by the loan documents.
32) Misleading clients about mortgage modifications, when, in reality, it was working behind the scenes to move forward with foreclosure
33) Charging improper, or fraudulent fees:
34) Refusing to provide prompt loan payoff information
35) Starting foreclosure when loan payoff is requested to inflate the cost or to prevent loan payoff from occurring
36) Engaging in abusive or deceptive practices to prevent loan payoff from occurring
37) necessary information for loan refinance: Mortgage servicers may fail to provide loan
38) Improper purchase of forced place insurance at inflated cost to inflate the amount of the debt and increase the chances of taking the property.

40

39) Taking actions to force clients into default and to pad and artificially inflate the loan amount

40) Refusing to provide copies of insurance purchased or to supply customers with information about same

41) Refusing to refund unearned premiums. If you ask them for information regarding the insurance they claim was purchased, you'll get nothing.

42) Unlawful foreclosure, by creating circumstances that exacerbated the default and hardship

43) Placing insurance without informing customer

44) Misleading customers about status of modification, while its attorneys moved towards foreclosure auction.

45) Docketing Rule 120 proceedings in bad faith or for the purpose of harassment

46) Filing a Notice of Election and Demand in bad faith when client is attempting to repay loan.

47) Failing to communicate and notify client of its actions

48) Engaging in false, misleading, and deceptive practices with its client

49) Sending false and misleading communications and notifications to its clients

50) Taking action to prevent client from receiving timely notices

51) Padding the loan with fraudulent charges to strips the property of its equity

52) Engaging in false, deceptive, or misleading representations or means in connection with the collection of any debt.

53) Falsely representing the legal status of any debt;

54) Using any false representation or deceptive means to attempt to collect a debt.

55) Intentionally using unfair or unconscionable means to attempt to collect a debt;

56) Collection of interest, fees, charges, or expenses incidental to the principal obligation not expressly authorized by the agreement creating the debt

57) Intentionally taking nonjudicial action to effect dispossession of property while feigning and misrepresenting in communications that there was no present to do so;

58) Otherwise breaching its contracts with its clients

As to Yajia and Mark:

129.    That as a result of the foregoing, Yajia and Mark have suffered and will continue to suffer damages from such fraudulent and tortious conduct of nearly one quarter million dollars ($222,708.35) as of March 2022 (Ex. Q), subject to increase, legal fees and costs as of the date of this filing of $76,050 in fees and $880 in costs, also subject to increase, and will suffer further contract damages in the amount of $3,860,000 plus damages of $8,333,333 for the lost $250,000 in revenue annually at a 3% capitalization rate (250,000/.03 – 8,333,333), should Bank of America succeed in either obtaining ownership of the Property by default at sale or liquidating the Property at

non-judicial Sale.

126.     WHEREFORE, on behalf of themselves and their respective trusts, Yajia and Mark
PRAY for this Honorable Court to: (a) order Bank of America  to pay $299,638.35 through the date
of this filing, subject to further increase as this case progresses, as actual damages, plus (b) order
Bank of America to pay three times that amount as punitive damages for mortgage servicing fraud
of $936,355.05, also subject to increase as this case progresses; c) and should Bank of America
succeed in either obtaining ownership of the Property by default at sale or by liquidating the
Property at non-judicial Sale, order Bank of America to pay them $3,860,000 in compensatory
damages plus damages of $8,333,333 for the lost $250,000 in revenue annually at a 3%
capitalization rate (250,000/.03 – 8,333,333), (d) order the Defendants to pay f three times that
amount, $11,580,000 plus $24,999,999 as punitive damages for fraud;(e) order Bank of America to
pay the Undersigned  set of reasonable attorneys' fees, (f) prejudgment interest;  and (g) for all other
relief this Court deems proper.

 As to Putative Class(es) I-XX:

130.     That as a result of the foregoing, the other members of the Putative Class(es) I-XX
have suffered and will continue to suffer monetary damages with respect to improper charges
collected by Bank of America from them or improper charges added by Bank of America to their
respective Class Member Notes, and in numerous cases complete loss of their Class Member
Properties as and for their contract damages in amount(s) to be determined during discovery, and
subject to increase, plus legal fees and costs.

131.     WHEREFORE, on behalf of other members of the Putative Class(es) I-XX, Yajia
and Mark PRAY for this Honorable Court to: (a) order Bank of America to them or (or to a general
fund established for their benefit) contract damages in amount(s) to be determined during discovery;

(b) plus order Bank of America to pay three times that amount as punitive damages for mortgage servicing fraud in amount(s) to be determined during discovery; usual and customary lodestar legal fees; (c) prejudgment interest; and (d) for all other relief this Court deems proper.

**COUNT III**
**VIOLATIONS OF THE FEDERAL FAIR DEBT COLLECTION PRACTICES ACT**
**15 U.S. CODE § 1692F, ET. SEQ.**

132.　　All preceding Paragraphs of this Complaint are incorporated herein by reference with the same force and effect as if set forth in full below:

133.　　In conducting themselves as previously alleged, Bank of America and its agents and representatives and attorneys knowingly, intentionally and repeatedly violated The Federal Fair Debt Collection Practices Act, 15 U.S. Code § 1692f Et Seq in one or more the following ways, including but not limited to:

(a) Intentionally engaging in false, deceptive, or misleading representations or means in connection with the collection of any debt, thereby violating 15 U.S. Code §1692f §807 (False or misleading representations);

(b) Falsely representing or the true legal status of any debt, thereby violating 15 U.S. Code §1692f §807(2)(A) (False or misleading representations);

(c) Intentionally using any false representation or deceptive means to attempt to collect a debt, thereby violating 15 U.S. Code §1692f §807(10)  (False or misleading representations);

(d) Intentionally using unfair or unconscionable means to attempt to collect any debt 15 U.S. Code §1692f §808 (Unfair practices);

(e) Intentionally billing or collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) insurance, etc. when such amount was not expressly authorized by the agreement creating the debt or permitted by law. 15 U.S. Code §1692f §808 (1) (Unfair practices); and

(f) Intentionally taking nonjudicial action to effect dispossession of property while feigning and misrepresenting in communications that (B) there was no present intention to take possession of the property; 15 U.S. Code §1692f §808(10)(Unfair practices);

(g) And otherwise violating the Act. 15 U.S. Code § 1692f Et Seq

134.    Section § 813 of The Federal Fair Debt Collection Practices Act, 15 U.S. Code §

1692f  sets forth the Civil Liability for such violations in pertinent part, as follows:

> (a) Amount of damages
> Except as otherwise provided by this section, any debt collector who fails to
> comply with any provision of this subchapter with respect to any person is liable
> to such person in an amount equal to the sum of:
>
> (1) **any actual damage sustained** by such person as a result of such failure;
>
> (3) **in the case of any successful action to enforce the foregoing liability, the
> costs of the action**, together with a reasonable attorney's fee as determined by
> the court.
>
> (3) **On a finding by the court that an action under this section was brought
> in bad faith and for the purpose of harassment, the court may award to the
> defendant attorney's fees reasonable in relation to the work expended and
> costs**.
>
> (2) (A) in the case of any action by an individual, such additional damages as the
> court may allow, but not exceeding $1,000; or
>
>     (B) in the case of a class action, (i) such amount for each named plaintiff as
> could be recovered under subparagraph (A), and (ii) such amount as the court
> may allow for all other class members, without regard to a minimum individual
> recovery, not to exceed the lesser of $500,000 or 1 per centum of the net worth
> of the debt collector;
>
> 15 U.S. Code § 1692f , Section § 813

 <u>As to Yajia and Mark:</u>

135.    As alleged herein, Bank of America and its Counsel Dell'Acqua and Shilliday

intentionally violated each of the foregoing provisions set forth above.

136.    Even notwithstanding the fraudulent forced placed charges alleged herein, Bank of

America's conduct towards Mark and Yajia as alleged herein – and especially the conduct of its

counsel Dell'Acqua and Shilliday on and since March 10, 2020, is sanctionable and warrants an

immediate award of attorney fees and costs.

44

137.    This entire R. 120 action should never have been docketed in the first place and the Undersigned should not have been forced to expend his professional time and energy – while infirmed and hospitalized - to rectify matters as well as respond to Bank of America's Motion for Remand.

138.    Given Shilliday's patent abuse Local Rule 7.1(a) and Duty To Confer and willful deception of the Undersigned and buy time to rush to the State Courthouse to do the very things the Undersigned sought her and Bank of America's consent not to do – and which they had no right to do given the primacy of first-filed federal judicial proceedings and exclusive subject matter and in personam jurisdiction over the Property and Parties with competing claims against it – which Shilliday cannot claim ignorance of. See 'Exhibit 3 to Verified R. 120 Motion', reciting D. Col. 22-Cv-00930's service list practically *verbatim*; (Ex. AA)

139.    Astoundingly, this R. 120 action was docketed by BOA not only in bad faith by unethical and deceptive means by its Counsel towards an opposing litigant and a fellow member of the bar following good faith L.R Rule 7.1(a) conferral in District Court Case 22-Cv-00930, but also in knowing contravention of controlling legal authority and the Priority Rule requiring that it be stayed,  dismissed, or consolidated. *Town of Minturn v. Sensible Housing Co*., 2012 CO 23, 273 P.3d 1154 (2012)

140.    But for Bank of America and Shilliday's calculated and willful violation of these duties and clearly harassing deceptive and abusive collection and litigation ploy of docketing a R. 120 action designed to accelerate non-judicial sale proceedings to harass and prejudice Yajia and Mark's rights, contract claims and defenses, and rights to notice and due process, and doing so without meaningful conferral, and notwithstanding awareness of the primacy and earlier pendency of first-filed federal judicial proceedings with exclusive jurisdiction over the Property, the

Undersigned would not have needed to expend his professional time and involve the Court with the instant Complaint, Motion to Dismiss, Motion for Sanctions and Response to BOA's Motion for Remand (D.12)

141.    WHEREFORE, Under these circumstances, Mark and Yajia PRAY FOR an interim award of $76,050 in fees and $880 in costs, plus $2,000 each as actual damages at this time, plus legal fees and costs, prejudgment interest, and actual individual member damages pursuant to the relief afforded for such violations under the Federal Fair Debt Collection Practices Act, 15 U.S. Code § 1692f. [21]

As to Putative Class(es) I-XX:

142.    WHEREFORE, Mark and Yajia on behalf of other members of the Putative Class(es) I-XX 141 PRAY FOR an award of damages (B) in the case of a class action, (i) such amount for each member the Putative Class(es) as could be recovered under subparagraph (A), and (ii) such amount as the court may allow for all other class members, without regard to a minimum individual recovery, not to exceed the lesser of $500,000 or 1 per centum of the net worth of the debt collector, pursuant to 15 U.S. Code § 1692f , Section § 813, plus actual individual member damages where appropriate, plus lodestar legal fees; prejudgment interest; and for all other relief this Court deems proper.

---

[21] Under penalty of perjury, I affirm that I am an attorney for nearly 30 years, a member of the federal bar and admitted in a number of states. My usual and customary billing rate is $780/hr. To date, I have incurred 18.5 hrs. between 6/16/22 and 7/11/22 on removal & conferral, and 79 hours on this matter since, plus filing fees of $402, $128, and $350, none of which would have been incurred had Shilliday and BOA agreed to withdraw their improper R. 120 filing and consented to stay such during the pendency of 22-Cv-00930, as requested, on June 16, 2022

## JURY DEMAND

Mark and Yajia on behalf of themselves, their trusts, and on behalf of the members of

Putative Class(es) I-XX, Plaintiff hereby demands a trial by jury for all claims and issues so triable

as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

Dated: August 18, 2022

Respectfully submitted,

Yajia Hu Schwartz, Individually and as Trustee of the
Yajia Hu Schwartz Revocable Trust, Mark A. Schwartz,
Individually and as Trustee of the Axis Investment
Holdings Trust, and on behalf of the Putative Class Members

By: /s/ Mark A. Schwartz, Esq

Dated: August 18, 2022

Mark A. Schwartz, Esq.  (Co Bar No. 38364)
Law Office of Mark A. Schwartz
425 Carr 693, Suite 1-381
Dorado, Puerto Rico 00646
maschwartz@tllgrp.com
(312) 810-2220

## CERTIFICATE OF SERVICE

I hereby certify that I caused this Motion to be served electronically by the Court's ECF

filing system to all parties of record and by email to those not yet of record, on this day of August

18, 2022